UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Equal Employment Opportunity
Commission,
    Plaintiff

    v.                                 Case No. 11-cv-454-SM
                                          Opinion No. 2013 DNH 116
Windmill International, Inc.,
    Defendant


**O R D E R**

On April 12, 2010, Windmill International fired Nancy Hajjar from her job as an accountant, citing poor performance. Subsequently, the Equal Employment Opportunity Commission ("EEOC") filed this action, charging that Windmill engaged in unlawful disability discrimination, in violation of the Americans with Disabilities Act ("ADA"), by terminating Hajjar's employment because of an actual and/or perceived disability. On behalf of Hajjar, the EEOC seeks compensatory and punitive damages, as well as injunctive relief. Windmill denies that its decision to fire Hajjar was in any way discriminatory or unlawful.

Windmill seeks summary judgment, insisting that its decision to fire Hajjar was entirely unrelated to any real or perceived disability she may have. The EEOC, in turn, seeks partial summary judgment on two discrete points: first, its factual contention that Hajjar was diagnosed with (and actually suffers

from) Thoracic Outlet Syndrome, as well as partial blockages of her carotid arteries; and, second, that it is entitled to judgment as a matter of law as to Windmill's sixth affirmative defense (Windmill's assertion that Hajjar failed to mitigate her damages).

For the reasons discussed, Windmill's motion for summary judgment is granted, and the EEOC's motion for partial summary judgment is denied.

## Standard of Review

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted). Nevertheless, if the non-moving

party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party. See generally Fed. R. Civ. P. 56(c). It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, speculation, and unsupported conclusions. See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997). See also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**Background**

The material facts are almost entirely undisputed. The primary dispute identified by the EEOC is whether Windmill had

made a "final decision" to terminate Hajjar's employment prior to the date on which she disclosed her medical condition, or whether it was still entertaining thoughts of retaining her as an employee and putting her on a performance improvement plan. But, that so-called genuine factual dispute arises from little more than the EEOC's own implausible reading of the factual record, speculation, and unsupportable inferences drawn from the witnesses' sworn testimony - none of which is sufficient to defeat Windmill's motion for summary judgment. The relevant facts are as follows.

Windmill hired Nancy Hajjar as an accountant in June of 2008. In her performance review, in March of 2009, Hajjar received a generally satisfactory evaluation, "meeting" expectations in six categories, and "partially meeting" expectations in three. Nevertheless, her supervisors were concerned about what they perceived to be performance issues. Those issues are well-documented in the record and need not be recounted. It is sufficient to note that, by the fall of 2009, Hajjar's direct supervisor (Jill Kwitkiwski) had become sufficiently displeased with Hajjar's performance that she recommended to John Katz (Director of Human Resources) and John Sullivan (Vice President for Business Support Services) that Windmill terminate Hajjar's employment. See Affidavit of Jill

Kwitkiwski (document no. 23-2) at para. 10; Affidavit of John Katz (document no. 23-18) at para. 7; Affidavit of John Sullivan (document no. 23-33) at para. 10.[1]  The EEOC concedes that, in late 2009, Kwitkiwski recommended that Windmill fire Hajjar.  See EEOC's Amended Objection (document no. 36) at 3.  The EEOC also concedes that Kwitkiwski, Katz, and Sullivan began more serious and substantive discussions about terminating Hajjar's employment in January of 2010.  Id. at 5.  See also Kwitkiwski affidavit at 14; Katz affidavit at para. 10; Sullivan affidavit at para. 10.  Katz thought Hajjar's employment should only be terminated after a plan had been put in place to redistribute her work to other Windmill Employees.  Katz affidavit at para. 7.  See also EEOC's Amended Objection at 5.  And, all understood that it could take a few months to actually implement the decision to fire Hajjar.  See, e.g., Sullivan affidavit at para. 15.

In February of 2010, Sullivan proposed to Kwitkiwski and Katz the possibility of putting Hajjar on a performance improvement plan ("PIP").  Each testified, however, that the proposed use of a PIP was simply part of an overall plan to more fully document Hajjar's shortcomings and terminate her

---

[1] It is probably worth noting that Kwitkiwski, Katz, and Sullivan are no longer employed at Windmill and, therefore, have no real interest or personal stake in the outcome of this litigation.

employment; none believed that she was capable of satisfactorily completing a PIP.  See Kwitkiwski affidavit at para. 19; Katz affidavit at paras. 14 and 15; Sullivan affidavit at paras. 12. In an e-mail she sent to both Katz and Sullivan on February 18, 2010, Kwitkiwski explained the parties' planned reallocation of Hajjar's duties once she was fired from her position at Windmill:

> Obviously, this [reallocation of duties] would need to happen after [Hajjar] is removed from her role. Pursuant to our discussion last week, I plan to place [Hajjar] on a P.I.P. the week of the 22nd [of February, 2010].  I will need your support to review the plan I generate, and also add anything you feel would cover Windmill from a legal perspective.

Exhibit 9 to Kwitkiwski affidavit (document no. 23-11).

By March 5, 2010, however, the group determined that Hajjar would not be put on a PIP and, instead, her employment would simply be terminated.  See Kwitkiwski affidavit at para. 24; Katz affidavit at para. 19; Sullivan affidavit at para. 14. Accordingly, in anticipation of the termination of Hajjar's employment, Kwitkiwski sent an e-mail to both Katz and Sullivan, outlining how Hajjar's duties at Windmill would be redistributed to employees in both the accounting and human resources departments.  Exhibit 13 to Kwitkiwski affidavit (document no. 23-15) ("Attached please find the plan to redistribute Nancy's current duties.").  Three days later, she sent an e-mail to Katz,

6

making reference to "mov[ing] forward with our plan." Exhibit 14 to Kwitkiwski affidavit (document no. 23-16). Both Kwitkiwski and Katz testified that they understood her reference to "our plan" to mean their decision to terminate Hajjar's employment. Kwitkiwski affidavit at para. 25 ("I referred to moving 'forward with our plan' which is a reference to the plan to terminate Ms. Hajjar's employment."); Katz affidavit at para. 20 ("On March 8, 2010, Ms. Kwitkiwski e-mailed me . . . In this e-mail, Ms. Kwitkiwski specifically referenced the planned termination of Ms. Hajjar's employment. Ms. Kwitkiwski referred to moving 'forward with our plan' which I understood to mean the plan to terminate Ms. Hajjar's employment that Mr. Sullivan, Ms. Kwitkiwski and I had been working on in earnest since January 2010.").

Approximately two weeks later, on March 22, 2010, Hajjar informed Kwitkiwski that she needed to consult with a specialist regarding a blocked carotid artery. All agree that this was the first time Hajjar mentioned this medical condition to anyone at Windmill. See EEOC Amended Objection at 7. Two days later, Kwitkiwski sent an e-mail to Katz in which she said she hoped that, notwithstanding Hajjar's recent disclosure, corporate counsel would permit them to "move forward." Both Kwitkiwski and Katz testified that the statement about "moving forward" was a reference to their decision to terminate Hajjar's employment.

7

Kwitkiwski affidavit at para. 27 ("By e-mail dated March 24, 2010, I wrote to Mr. Katz: 'I hope Peter [Bennet, corporate counsel] says we can still move forward.'  I was referring to my wanting to move forward with the termination of Ms. Hajjar's employment in early April.").  In his affidavit, Mr. Katz testified about that e-mail as follows:

> On March 24, 2010, Ms. Kwitkiwski e-mailed me regarding another performance issue related to Ms. Hajjar.  As part of this e-mail, Kwitkiwski wrote: "I hope Peter says we can still move forward."  Peter W. Bennett is Windmill's corporate attorney.  I understood that Ms. Kwitkiwski was expressing hope that Windmill's corporate attorney would inform us that we could still move forward with the termination of Ms. Hajjar's employment since the decision to terminate her predated her disclosure of the carotid artery issue by months.

Katz affidavit at para. 22.

Windmill did move forward with the termination of Hajjar's employment.  On April 12, 2010, Katz met with Hajjar and notified her of Windmill's decision to fire her.  Katz affidavit at para. 23.  All three of Windmill's former employees who were involved in the decision to terminate Hajjar's employment testified that: (1) they jointly reached the decision to fire Hajjar and, after some discussion, agreed not to put her on a PIP; (2) the decision to fire Hajjar was reached well before she disclosed her medical condition to anyone at Windmill; (3) that decision was based solely on performance issues and was entirely unrelated to her

8

later-disclosed medical condition; and (4) the timing of her discharge and its temporal proximity to her disclosure were entirely coincidental. See Kwitkiwski affidavit at para. 29; Katz affidavit at para. 24; Sullivan affidavit at para. 21. The EEOC has pointed to no evidence that contradicts, undermines, or otherwise casts doubt upon that testimony.

## Discussion

Title I of the ADA prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to . . . . the discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The burden-shifting framework employed in discrimination cases of this sort is by now well-known. See generally McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In short, the EEOC must make out a prima facie case of disability discrimination by showing that: (a) Hajjar was "disabled" within the meaning of the ADA; (b) she was able to perform the essential functions of her job, with or without accommodation; and (c) she was subject to an adverse employment action based, at least in part, on her disability. x See, e.g., Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76,82 (1st Cir. 2008). In response, Windmill must articulate a legitimate, non-discriminatory basis for its action. If Windmill carries that burden, "the initial

inference of discrimination evaporates and the burden then shifts back to the plaintiff to proffer evidence to establish that [the defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007) (citations omitted). See also Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir. 2005).

Here, the court will assume that, based upon the temporal proximity between Hajjar's disclosure and her termination, the EEOC has carried its modest burden of making out a prima facie case of unlawful discrimination. In response, Windmill has proffered a legitimate, non-discriminatory reason for its action, and has presented uncontradicted evidence supportive of its claim to have discharged Hajjar for reasons entirely unrelated to her medical condition. Accordingly, the burden of proof reverts to the EEOC to point to sufficient evidence in the record to support a jury's finding that Windmill engaged in unlawful disability discrimination. It has failed to carry that burden.

The core of the EEOC's argument in opposition to summary judgment is the following: because there was still talk of putting Hajjar on a performance improvement plan as late as February of 2010, and because of the temporal proximity between

Hajjar's disclosure and her termination, a jury could reasonably infer that, until it learned of her medical condition, Windmill had planned to retain Hajjar as an employee and put her on a PIP. In other words, the EEOC says the record supports a reasonable inference that Windmill decided to fire Hajjar only _after_ it learned of her medical issues, on March 22, 2010.  See, e.g., EEOC's Amended Objection at 18 ("There is evidence that, prior to learning about Hajjar's carotid artery impairment, Defendant made plans by February 2010 to place her on a performance improvement plan. . . A jury could therefore reasonably infer that before learning about Hajjar's carotid artery impairment, Defendant planned to provide Hajjar an opportunity to remain employed for at least the duration of her performance improvement plan."). The court disagrees.

The last reference in the record suggesting that Windmill was contemplating putting Hajjar on a PIP is dated February 12, 2010.  See EEOC's Amended Objection at 11, para. 22 (citing Exhibits 8 and 9 to Kwitkiwski affidavit).  But, even assuming the discussion about putting Hajjar on a PIP was _not_ part of the overall plan to fire her, the uncontradicted sworn testimony of Kwitkiwski, Katz, and Sullivan is that by early March of 2010, they decided to forego the use of a PIP and agreed to simply terminate Hajjar's employment outright - a decision that they

11

reached well before Hajjar ever disclosed her medical condition to Windmill. See Kwitkiwski affidavit at paras. 24 and 29; Katz affidavit at paras. 19, 23, and 24; Sullivan affidavit at paras. 14, 17, and 21.[2]

Little more need be said. The inference the EEOC would have a jury draw - that until Windmill learned of Hajjar's medical condition, it intended to retain her as an employee and put her on a PIP - is neither reasonable nor is it even plausible in light of the unrebutted sworn testimony of Windmill's former employees Kwitkiwski, Katz, and Sullivan. Consequently, the EEOC cannot, as a matter of law, sustain its burden of proof and Windmill is entitled to summary judgment on the sole count of the EEOC's complaint.

## Conclusion

For the foregoing reasons, as well as those set forth in defendant's memoranda (documents no. 23-1 and 34), the

---

[2] Parenthetically, the court notes that it was not unusual for Windmill to fire an employee without first putting him or her on a PIP. The evidence of record suggests that only twice did Windmill use a PIP and, on both occasions, it involved employees Windmill apparently considered receptive to, and capable of, improvement. Both of those employees satisfactorily completed their performance improvement plans and remained employed with Windmill. That Windmill fired Hajjar without first putting her on a PIP is not evidence of disability based discrimination.

12

uncontroverted evidence of record demonstrates that the decision to terminate Hajjar's employment predated - by a significant period of time - her March 22, 2010, medical disclosure.  On this substantial record, the EEOC cannot demonstrate that her termination was in any way related to that disclosure, rather than the well-supported and non-discriminatory reason given: unacceptable job performance.  Accordingly, Windmill is entitled to judgment as a matter of law on the sole count in the EEOC's complaint and its motion for summary judgment (document no. 23) is granted.  The Equal Employment Opportunity Commission's motion for partial summary judgment (document no. 25) is denied.  All remaining pending motions are denied as moot.

    The Clerk of Court shall enter judgment in accordance with this order and close the case.

    **SO ORDERED.**

                                          _____
                                          Steven J. McAuliffe
                                          United States District Judge

September 4, 2013

cc:  Elizabeth A. Grossman, Esq.
     Markus L. Penzel, Esq.
     Raechel Adams, Esq.
     Robert D. Rose, Esq.
     Justin Mulaire, Esq.
     Peter Bennett, Esq.
     Frederick B. Finberg, Esq.